UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| GARY W. PAUL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:21-CV-12-REW |
| | ) | |
| v. | ) | |
| | ) | OPINION AND ORDER |
| WHITLEY COUNTY DETENTION | ) | |
| CENTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendants Brian Lawson, Austin Philpot, Whitley County Detention Center, and the Whitley County Fiscal Court move for summary judgment on Plaintiff Gary W. Paul's remaining claims. *See* DE 109 (Lawson/Whitley County Joint Motion); DE 111 (Philpot Motion). For the following reasons, and under the Rule 56 rubric, the Court grants both motions.

## I.    Background

### A.    The Underlying Incident(s)

This action involves many competing narratives about the events that transpired on the night of February 1, 2020, through the morning of February 2, 2020. Nonetheless, the parties agree that the incident generally unfolded as follows or included certain commonalities: On the night of February 1, 2020, Williamsburg City Police Officer Dorman Patrick arrested Plaintiff Gary W. Paul and charged him with driving under the influence. Patrick Dep. (DE 107) 13:5–13:8; Paul Dep. (DE 102) 51:23–52:3, 58:1–58:5, 58:17–58:19. Patrick took Paul to Whitley County Detention Center for booking. Patrick Dep. 28:6–28:8; Paul Dep. 59:3–59:5. Deputy Austin Philpot was an officer on duty at the Detention Center. Haynes Dep. (DE 105) 17:24–18:9; Patrick Dep. 48:13–48:18; Paul Dep. 69:10–69:16. During the booking process, the deputies

directed Paul to put on a jumpsuit, but he refused to do so.  Paul Dep. 59:16–59:22; *see also* Philpot Dep. (DE 104) 36:8–36:13; DE 111-3 (Exhibit 2, Incident Report).   After Paul's continued noncompliance, a male deputy maced Paul; the identify of that male deputy is disputed, even according to Paul's own version of events.  *Compare* Paul Dep. 70:14–70:20, 71:6–71:12, 72:17–72:22 *with* DE 111-2 (Exhibit 1, Paul's Interrogatory Response); *see also* Osborne Dep. (DE 106) 21:6–21:7; DE 111-3.  At some point, and in a series of interactions, jail personnel tackled Paul to the floor and put him into a chokehold.  Patrick Dep. 15:3–15:9, 16:16–16:24; Paul Dep. 72:21–72:24, 76:3–76:5, 78:10–78:12; Philpot Dep. 37:1–37:3, 52:20–52:24; *see also* Compl. ¶ 17; DE 111-3.  Eventually, Paul was placed into the shower to decontaminate and later released on his own recognizance at 7:40 a.m. the next morning.  Paul Dep. 73:1–73:5, 80:16–18; DE 116-1 at 2 (Exhibit 1, Admission Report).

Paul's account of the night includes further detail about the sequencing of events and clarifies what parts he sues over.  The Court derives this from Paul's Complaint, his sworn interrogatory answers, and his deposition.  According to Paul, Patrick, the arresting officer, had already left when the "beating" occurred.  Paul Dep. 58:15–58:16.  At that time, Philpot ordered Paul to put on his jumpsuit.  *Id.* at 59:16–59:20.  Paul, who stood up in opposition, refused to comply because he would be "out" of the facility in "ten minutes" after making a phone call.  *Id.* at 59:19–59:22.  Philpot then grabbed Paul by the shoulders.  *Id.* at 59:23–60:7.  In response, Paul told Philpot that he would not "take it" and that Philpot "wouldn't [force Paul to dress] by hisself [sic]."  *Id.* at 60:1–60:7, 64:13–64:14.  Paul admits that he also slapped or batted away Philpot's hands.  *Id.* at 60:6–60:7; *id.* at 107:6–107:10.  During this exchange, a different deputy discharged mace, and Paul was tackled to the ground face-first.  *Id.* at 60:8–60:12; 76:16–76:17.  After hitting

the floor, Paul only remembers that he was beaten, choked and restrained before he was thrown into the shower. *See id.* at 60:10-60:12, 64:19–64:22, 70:17–70:20, 71:11–71:12.

Philpot and other Detention Center staff tell a slightly different tale, sequence included. Throughout the incident, Paul appeared "very angry, agitated" and acted "aggressive" towards Philpot. Haynes Dep. 24:11–24:21; Philpot Dep. 36:8–36:13. Fixated on placing a phone call, Philpot claims that Paul tried to retrieve his cellphone from behind the booking counter instead of obeying orders to sit down. Philpot Dep. 36:8–36:14, 41:9–41:16. When Philpot and Patrick guided Paul to a bench, Paul refused to sit down, and Patrick attempted to grab him. *Id.* at 36:13–36:14, 36:24–37:3, 39:10–39:15. Paul then swung at or toward Patrick, causing Philpot to tackle Paul to the ground and put him in a chokehold. *Id.* at 27:1–27:19, 37:1–37:3, 39:10–39:15. Philpot promptly handcuffed Paul and sat him on the bench. *Id.* at 54:1–54:3. According to Philpot, he did not administer mace, Sergeant Dilyn Osborne later did. *Id.* at 48:16–48:18. Importantly, Philpot read the Osborne summary as not including his take down of Paul. *See* Philpot Dep. 47:17–47:21, 48:3–48:12. Patrick likewise said the events Osborne depicted occurred later in the night and did not involve Patrick's presence or involvement. *See* Patrick Dep. 57:8–57:17 ("that's a totally . . . another incident that I have no involvement in whatsoever.").

In his deposition, Patrick confirmed that Paul was upset that he could not access his cell phone and appeared "verbally upset" with jail staff. Patrick Dep. 14:15–14:19. However, Patrick testified that "there was nothing that Mr. Paul was doing that . . . would've made [him] physically . . . restrain [Paul] at the time" and that he did not feel the "need" to administer mace on Paul. *Id.* at 14:20–15:2, 17:11–17:13. Philpot "startled" Patrick when he pushed past him, took Paul to the floor, and at some point, placed Paul in a chokehold. *Id.* at 14:2–14:14, 15:16–15:24. Patrick does not recall Paul hitting the ground but saw him land on top of Philpot instead. *Id.* at 15:3–15:15.

He described Philpot tackling Paul by the waist and Paul landing on Philpot, not on the ground and not face-first. *Id.* Patrick did not see anyone mace Paul. *Id.* at 16:16–16:18. Patrick's involvement seemingly ended after he, along with another trooper, promptly helped Paul onto (but not restrained into) a restraint chair. *Id.* at 17:17–17:21, 53:1–53:10.

An internal incident report—apparently drafted by Sergeant Osborne under Deputy Charles Strunk's username—describes Paul as repeatedly refusing to change into his jumpsuit during booking and walking away from the designated cell toward another door. *See* DE 111-3. After Paul failed to follow directives, Sergeant Osborne wrote that he maced Paul, and Paul was taken to the ground. *See id.* Due to Paul's continued resistance, he was also taken down while being dressed out, during his shower, and while putting on his jumpsuit. *See id.* Thus, Osborne's depiction a) does not reference the take down by Philpot with Patrick present but b) summarizes the macing and tackles/force-uses that occurred later and did not directly involve Philpot.

As a result of the incident, Paul alleges that he sustained swelling, bruising, and bleeding to his head, elbows, hips, knees, and ankles. Paul Dep. 78:3–78:9, 78:21–79:1, 84:3–84:10; 86:3–86:8. He also claims to have suffered additional leg damage, broken ribs, and cuts to his head and eyes. *Id.* at 81:5–81:9, 84:3–84:10.

The only named guard is Philpot; Paul did not sue Osborne or anyone else for misconduct on the night in question.

## B.   Procedural History

On January 29, 2021, Paul filed a complaint against Whitley County Detention Center, Whitley County Fiscal Court, Brian Lawson (individually and in his official capacity as the Jailer of the Detention Center), Austin Philpot (individually and in his official capacity), and unknown deputy jailers (individually and in their official capacity). DE 1 (Complaint). In the Complaint,

Paul asserted the following: 42 U.S.C. § 1983 excessive force claim against Philpot and unknown deputies (Count I); § 1983 negligent hiring, training, and supervision claim against Lawson (Count II); § 1983 negligent hiring, training, and supervision claim against the Fiscal Court (Count III); negligence claim against the Fiscal Court and Lawson (Count IV); negligence per se claim against the Fiscal Court and Lawson (Count V); battery claim against Philpot and unknown jailers (Count VI); negligent hiring and retention claim against the Fiscal Court and Lawson (Count VII); and punitive damages (Count VIII). *Id.* ¶¶ 32–79. However, the parties subsequently entered an agreed order requesting to drop the official capacity claims against Lawson and Philpot, and the state law claims against the Detention Center and the Fiscal Court. DE 15 (Agreed Order). The Court dismissed those claims with prejudice. [1] *See* DE 16 (Order of Dismissal).

Following that order, these claims currently remain: § 1983 excessive force claim against Philpot and unknown deputies in their individual capacities only (Count I); § 1983 negligent hiring, training, and supervision claim against Lawson, individually (Count II); § 1983 negligent hiring, training, and supervision claim against the Fiscal Court (Count III); negligence claim against Lawson, individually (Count IV); negligence per se claim against Lawson, individually (Count V); battery claim against Philpot and unknown jailers in their individual capacities only (Count VI); negligent hiring and retention claim against Lawson, individually (Count VII); and punitive damages (Count VIII). Defendants have moved for summary judgment on all remaining claims against them. *See* DE 109; DE 111. Paul has responded. *See* DE 114 (Response). Both movants replied. The matter is ripe for review.

---

[1] Oddly enough, the parties still submitted briefing regarding the previously dismissed claims. However, the record does not indicate that Paul ever attempted to revive those claims. Because the Court already dismissed the claims with prejudice, and the claims remain dismissed, the Court will not address any arguments related to the already dismissed claims.

## II.      Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ P. 56(a).  In determining whether a genuine dispute exists, the Court considers all facts and draws all inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).  The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986).  If the moving party satisfies its burden, the burden then shifts to the non-moving party to produce "specific facts" showing a "genuine issue" for trial. *Id.*   "A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020) (citation and quotation marks omitted).  Indeed, "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2514 (1986).  However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex Corp*, 106 S. Ct. at 2552.

## III.      Analysis

### A.      Claims Against Unknown Deputy Jailers

In the Complaint, Paul brings § 1983 excessive force and state law battery claims against "unknown deputy jailers." *See* Compl.  Generally, "[i]f a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant." Fed. R. Civ. P. 4(m).  "Courts have made an exception to this rule for cases involving

unknown . . . defendants when discovery will make known the unavailable identity of the defendant." *Strunk v. Liberty Ins. Corp.*, Case No. 5:18-cv-288-JMH, 2019 WL 724430, at *2 (E.D. Ky. Feb. 20, 2019).   Even if that exception applies, the plaintiff must still substitute a named defendant for the unknown defendant after discovery has closed or else the Court will dismiss the unknown defendant.  *See id.*

The deadline to complete discovery and to amend has long passed, *see* DE 98 (Order Extending Discovery), and Paul never moved to substitute named defendants for the unknown deputy jailers or to amend his complaint.  Therefore, the Court dismisses all claims against the unknown deputy jailers.

### B.    Federal Claims

### 1.    § 1983 Excessive Force Claim – Philpot (Count I)

To prove his excessive force claim, Paul, as a pretrial detainee, "must show 'that the force purposely or knowingly used against him was objectively unreasonable.'"  *Cretacci v. Call*, 988 F.3d 860, 869 (6th Cir. 2021) (quoting *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)).  Whether the force was objectively unreasonable "turns on the 'facts and circumstances of each particular case'" and "from the perspective of a reasonable officer on the scene."  *Kingsley*, 135 S. Ct. at 2473 (quoting *Graham v. Connor,* 109 S. Ct. 1865, 1872 (1989)).  Relevant considerations include

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*  Courts must also "account for the jail's legitimate interest in maintaining their facility" and "defer[] to policies and practices that are needed to preserve internal order and discipline and to

maintain institutional security."   *Cretacci*, 988 F.3d at 869 (citations and quotation marks omitted).

To analyze Paul's excessive force claim, the Court must first sift through the conflicting versions of the incident (really, incidents) and determine if, within those versions, there lies a genuine dispute of material fact.  In doing so, the Court faces a difficult and internally inconsistent record.

First, the undisputed part.  Officer Patrick arrested Paul for driving under the influence after 10:00 p.m. on February 1, 2020.  *See* DE 116-1 at 2.  He took Paul to the Whitley County Detention Center.  Patrick Dep. 28:6–28:8; Paul Dep. 59:3–59:5.  The jail released Paul at 7:40 a.m. the next morning.  *See* DE 116-1 at 2.

What happened between hinges on differing speakers and timelines.  For the parties before the Court, Paul's suit is only against Deputy Jailer Philpot, Jailer Lawson, and the County.  His story (drawn from the Complaint, his interrogatory answer (DE 111-2) and his deposition) is difficult to square even across his own telling.  The verified depiction accuses Philpot of excessive force during booking.  Per Paul, Officer Patrick had left Paul at the jail, after which a "beating" ensued.  *See* Paul Dep. 58:15–58:16.  The confrontation occurred as Philpot ordered Paul to leave booking and "dress out" into a jail jumpsuit; Paul refused, demanded his phone to make a phone call, and claimed the call would result in him being "out" in ten minutes.  *Id.* at 59:19–59:22.  Paul balefully suggested it would take more than one guard to make him get dressed.  *See id.* at 64:13–64:14.  Philpot eventually put his hands on Paul, who would not "take it."  *Id.* at 60:1–60:7.  This reaction included Paul slapping away Philpot's hands.  *Id.* at 60:6–60:7; 107:6–107:10.  Another officer then maced Paul, and Philpot took Paul to the ground.  *Id.* at 60:8–60:12.  Paul claims he was slammed to the floor face-first.  *Id.* at 76:16–76:17.  From that point, Paul could not really see

what happened (but he could feel being choked, beaten, restrained) before he was put into the shower to decontaminate. *See id.* at 60:10-60:12, 64:19–64:22, 70:17–70:20, 71:11–71:12. He claims several injuries from the take down, including broken ribs and other lasting effects. *See id.* at 78:3–78:9, 78:21–79:1, 81:5–81:9, 84:3–84:10, 86:3–86:8.

Critically, Paul expressly pegs his suit to events that occurred **after** Patrick left him at the jail. The Complaint and discovery responses clearly describe, as the basis for suit, an event where officers at the jail took Paul to the ground after an officer maced Paul. Under oath, Paul described that event as happening after Patrick left the jail. Unequivocally, per Plaintiff, "[J]ust as soon as the policeman left, it started." Paul Dep. 69:8–69:9; *id.* at 59:14–59:16 ("[Patrick] said, 'I hope it works out for you, Gary,' and then he left."); *id.* at 58:15–58:16 ("And that's when the beating come in, after he left.").

Philpot agrees that he took Paul down once, though the context is quite different. Per his telling, Paul was angry and noncompliant in booking. *See* Philpot Dep. 36:8–36:14. He demanded his cell phone and indeed attempted to get behind the booking desk to retrieve the phone himself. *Id.* at 36:8–36:14, 41:9–41:16. In an effort to control Paul and usher him through the process, Philpot states that he (with Patrick involved) was going to guide Paul back to a bench when Paul swung at or toward Patrick. *See id.* at 36:24–37:3, 39:10–39:15. This resulted in Philpot taking Paul to the ground, briefly using a choke hold, and then cuffing Paul before placing him on a bench. *See id.* at 27:1–27:19, 37:1–37:3, 54:1–54:3. Philpot agrees that, at some point in the course of the process, Sergeant Osborne maced Paul. *See id.* at 48:16–48:18. Later events—like the shower trip—evidently did not involve Philpot, who was about to go off shift. *See id.* at 42:12.

Patrick agrees that he arrested Paul and took him to the jail. *See* Patrick Dep. 13:5–13:8, 28:6–28:8. He witnessed Philpot take Paul to the ground one time. *See id.* at 14:2–14:5. Paul was

agitated over his cell phone and upset with jail staff.  *See id.* at 14:15–14:19.  Patrick sensed no resistance from Paul, but Philpot (from behind Patrick) startled Patrick by pushing past him and tackling Paul (with Paul landing on Philpot, not face-first on the ground).  *See id.* at 14:2–14:14, 14:20–15:2.  Patrick saw Philpot employ a chokehold, but Patrick and another trooper quickly helped Paul up and onto (but not into) a restraint chair.  *See id.* at 15:16–15:24, 17:17–17:21, 53:1–53:10. Patrick then left; he recalled no use of mace by anyone.  *See id.* at 16:16–16:18.

Finally, Sergeant Osborne's version appears in his later report from that night, entered under Deputy Strunk's log-in.  *See* DE 111-3.  Osborne's version in some ways picks up where Paul's sworn version does, during the booking process and without the presence or involvement of Patrick.  *See id.*  Osborne relates that he and Strunk confronted Paul as Paul a) was refusing to dress out and b) was non-compliantly walking away from booking and toward another door.  *See id.*  After Paul refused multiple times to comply, Osborne pepper-sprayed him, and the officers took Paul to the ground.  *See id.*  Osborne in fact relays *three* different times that he and Strunk tackled or used force on Paul between booking, the shower process, and the post-shower dress out. *See id.*

Where, drawing reasonable inferences in Paul's favor, does this leave the facts to be assessed?

First, the only defendant subject to analysis for his own individual acts is Philpot.  Paul generically named other deputies but never amended the Complaint to name them.  Thus, conduct by Osborne, Strunk, or any others is not at issue in terms of direct liability of a named defendant.

Second, Paul, under oath, and contrary to the Complaint, concedes that Philpot did not mace him.  *See* Paul Dep. 70:14–70:20, 71:6–71:12.  Further, his sworn version is that the force at issue occurred after Patrick had left the jail.  *See id.* at 58:15–58:16.  It would be counter to the

record, however viewed, and logic to reject Plaintiff's own verified sequencing. Third, per Paul, he was directly and obdurately defiant to the jail's booking process—he flatly refused to dress out and demanded immediate access to his phone, claiming he would remain dressed in his own clothes and that a phone call by him would have Paul "out" of custody in "ten minutes." *See id.* at 59:19–59:22. His acts towards Philpot included categorical refusal to change his clothes as directed and to relent on the immediate phone call. *See id.* When Philpot put his hands on Paul's shoulders, Paul "slapped" Philpot's hands away. *Id.* at 60:6–60:7. He told Philpot it would take more than one guard to force him to dress. *See id.* at 64:13–64:14. Paul assuredly stated that he "wouldn't take" the jail's demands to get dressed and delay any phone call until after booking. *See id.* at 60:1–60:7. After this noncompliance, officers took Paul down to the ground. *See id.* at 60:10–60:12. While Paul contends that he was choked, beaten, and restrained, he was blinded by the mace and does not specifically allege Philpot's involvement thereafter. *See id.* at 60:10–60:12, 64:19–64:22, 70:17–70:20, 71:11–71:12.

The question then becomes, based on Paul's sworn version of the events at issue in the Complaint, was the amount of force used against Paul objectively unreasonable? That is, could a reasonable jury find that it was objectively unreasonable for Philpot to tackle and forcefully cuff Paul after Paul continuously and staunchly refused to comply with directives to dress out, demanded to use his cell phone, physically resisted at the first sign of force from Philpot, and intimated further resistance? The Court has doubts.

On one hand, by his admission, Paul failed to obey Philpot's orders to change into his jumpsuit, insisting on making a phone call instead. A reasonable jury could conclude that some force was necessary (at the very least, for Philpot to grab Paul by the shoulders) to appropriately "preserve internal order and discipline," *see Cretacci*, 988 F.3d at 869, in the Detention Center's

booking process.  Not only did Paul verbally resist orders, but he also physically resisted Philpot by slapping away his hands.  *See Cretacci*, 988 F.3d at 870 ("[A]ctive resistance to an officer's command can legitimize an officer's use of force. . . . Such resistance can take the form of verbal hostility or a deliberate act of defiance.") (citations and quotation marks omitted).   While, debatably, it may have been excessive for Philpot to tackle Paul based solely on his refusal to get dressed, Paul's own account shows that the tackle occurred after Paul slapped away Philpot's hands, suggested that more than one guard would be needed to get him into the jumpsuit, and declared imperiously that he was not going to "take it."  In totality, Philpot could have reasonably perceived this conduct as a physical threat requiring additional force to restrain Paul, who "stood up" to Philpot, into compliance.

On the other, given the state of the record, it is not entirely clear whether Philpot made any attempt to diffuse the situation before using force to take Paul to the ground.  The facts do not indicate that Paul posed a marked security risk to the facility or was otherwise extremely dangerous—he was arrested for a DUI (a nonviolent offense) and his actual physical resistance was limited to slap away Philpot's hands.  Paul submits evidence that he suffered injuries that were not insignificant, though where or when these injuries were inflicted during that night is far less clear.  Paul does not attribute any conduct specifically to Philpot after the tackle, but a reasonable jury could perhaps find that the use of a chokehold, if Paul was on the ground and actually under control, was objectively unreasonable.  *See Coley v. Lucas Cnty.*,  799 F.3d 530, 540 (6th Cir. 2015) ("The use of a chokehold on an unresisting—and even an initially resistant—detainee violates the Fourteenth Amendment.").

Despite this potential factual issue, Paul's excessive force claims fails for a more glaring reason, one that Paul completely neglects in his own briefing.  Philpot raises the defense of

qualified immunity in response to the § 1983 excessive force claim against him in his individual capacity. *See* DE 111-1 at 13–15. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013) (quoting *Ashcroft v. al– Kidd*, 131 S.Ct. 2074, 2085 (2011)). In raising a qualified immunity defense, a defendant "bear[s] the initial burden of coming forward with facts" that, if true, suggest that he was "acting within the scope of [his] discretionary authority during the incident in question." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992); *see also Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991). Once the defendant properly raises the qualified immunity defense, the burden then shifts to the plaintiff to show that the official is not entitled to immunity. *See Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). A plaintiff only overcomes this burden by showing that "(1) the defendant violated a constitutional right and (2) that right was clearly established." *DiLuzio v. Vill. of Yorkville,* 796 F.3d 604, 608 (6th Cir. 2015). "The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Wegener*, 933 F.2d at 392.

To show that the official violated a "clearly established" right, the plaintiff must "define *with specificity* the clearly established legal rule that the officers allegedly violated." *Gambrel v. Knox Cnty*, 25 F.4th 391, 400 (6th Cir. 2022) (emphasis added). "[T]he general legal rule . . .that officers cannot use excessive force" is not enough. *Id.* "That defines the right at too high a level of generality." *Mosier v. Evans*, No. 23-5189, 2024 WL 93974, at *2 (6th Cir. Jan. 9, 2024). The legal rule "must have a sufficiently clear foundation in then-existing precedent" such that "every reasonable official would have understood that what he is doing violates that [rule]." *See Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 660 (6th Cir. 2021) (citations and quotation marks

13

omitted).  This requires the plaintiff to "identify a case' that found a constitutional violation based on sufficiently similar facts" which, due to these factual similarities, gave "the officers 'fair notice' that their force was unconstitutional." *Gambrel*, 25 F.4th at 400 (citation omitted).  The case need not be "directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Moderwell*, 997 F.3d 653 at 660 (citation and quotation marks omitted).  "The inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Coley*, 799 F.3d at 540 (citation and quotation marks omitted).

In asserting qualified immunity: Philpot points to the following facts: Throughout the booking process, Paul repeatedly disobeyed deputy orders to come to a designated cell and change out of his clothes into a jumpsuit.  DE 111-3.  He attempted to take his cellphone from behind the booking counter and acted "aggressive" towards Philpot.  Philpot Dep. 36:8–36:13.  After Paul refused to sit down, per Philpot's telling, Patrick tried to grab him.  *Id.* at 36:13–36:14, 36:24–37:3.  When Paul swung at Patrick in response, Philpot tackled Paul to the ground and put him in a chokehold before cuffing him.  *Id.* at 37:1–37:3, 52:20–52:24.  Importantly, Paul admitted that he did not comply with the directive to put on a jumpsuit and instead, insisted on making a phone call.  Paul Dep. 63:24–64:5.  Paul resolutely refused to change, demanded that a prompt call would lead to his release, and physically opposed the order to follow the booking process (to dress in the issued jail garb).

Under Kentucky law, a correctional institution officer may justifiably use "physical force" on "another person" if the official "believes that the force used is necessary for the purpose of enforcing the lawful rules of the institution," and the force is not otherwise prohibited.  Ky. Rev. Stat. § 503.110(2)(a).  This means that Philpot had the discretionary authority to use reasonable force to police the rules of the Detention Center, including as against Paul.  The facts indicate that

Paul refused to follow the rules of the Detention Center—he admitted that he did not abide by repeated deputy orders to get dressed out. *See* Paul Dep. 59:19–59:22, 63:24–64:5; *see also* DE 111-3. Based on Philpot's proffered evidence, he intervened to stymie any further escalation when Paul's disobedience heightened into physical resistance. Philpot Dep. 37:1–37:3. Accepting these facts as true for the sole purpose of determining whether Philpot meets his initial immunity burden, Philpot's use of force squared with his authority to enforce the rules of the Detention Center under Kentucky law. Therefore, at this preliminary step, Philpot has produced enough evidence to suggest that he was acting within his discretionary authority when he used physical force to tackle Paul.

The burden then shifts to Paul to overcome Philpot's qualified immunity defense by showing that Philpot violated Paul's constitutional rights and that those rights were clearly established. Paul makes **no attempt** to respond to Philpot's invocation of a federal qualified immunity defense. Because Paul failed to even respond to Philpot's federal qualified immunity defense, he has not met his burden to overcome the defense. *See Doe v. Bd. of Regents of Univ. of Michigan*, No. 22-2095, 2023 WL 5095799, at *2 (6th Cir. Aug. 9, 2023) ("[The plaintiff] failed to make any argument in the district court that the individual defendants were not protected by qualified immunity. The district court therefore concluded that he had forfeited the issue and granted qualified immunity. . . . We affirm the district court's grant of qualified immunity on this basis."); *Campbell v. Hines*, No. 12-4329, 2013 WL 7899224, at *4 (6th Cir. Aug. 8, 2013) ("Likewise, the district court properly declined to address the merits of [the plaintiff's] equal protection claim, because he failed to respond to the defendants' argument that they were entitled to qualified immunity."); *Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013) ("[W]hen the officers moved for summary judgment claiming qualified immunity, [the plaintiff's] attorney did

not respond. . . . His response brief failed even to include the terms 'qualified immunity' or 'clearly established.'  Inexorably, this led the district court to grant judgment for the defendants, a disposition this court can hardly now fault as a matter of law.").[2]  And, as a general matter, "[a] plaintiff . . . concedes a defense when they fail to respond to the defendant's argument."  *4th Leaf, LLC v. City of Grayson*, 425 F. Supp. 3d 810, 823 (E.D. Ky. 2019).  Without rebuttal, Philpot is entitled to qualified immunity as to the § 1983 excessive force claim against him in his individual capacity.  It is up to the plaintiff to point to the right-defining case, and Paul ignores the burden.

In raising the § 1983 excessive force claim in his complaint, Paul referenced the Fourth, Eighth, and Fourteenth Amendments, but in his response to Philpot's motion, he does not identify, with a factual foundation, the specific constitutional right that Philpot allegedly violated.  *See* Compl.¶ 34.  Instead, Paul argues that there is a genuine issue of material fact regarding whether Philpot's use of force was "objectively reasonable."  DE 114-1 (Response Memorandum) at 4–5.  But Paul does not tie this issue to a specific constitutional right as necessary to fulfill the first prong of his burden.  As for the second prong, beyond his broad and overly general discussion of objectively reasonable force, Paul does not specify any (or supply the case-defining) "clearly established" right or legal rule that Philpot violated.  Paul fails to pinpoint any case that found a constitutional violation based on facts that are sufficiently similar to the instant matter—a case

---

[2] *See also See Ewing v. Finco*, Case No. 1:17-cv-505, 2019 WL 8105992, at *10 (W.D. Mich. Sept. 18, 2019) ("[Plaintiffs] did not address defendants' claims of entitlement to qualified immunity.  These plaintiffs did not carry their burden by ignoring it."), *report and recommendation adopted*, No. 1:17-cv-505, 2019 WL 6485869 (W.D. Mich. Dec. 3, 2019); *Barker v. L.*, No. CIVIL ACTION NO. 0:15-cv-11-DLB-EBA, 2017 WL 630753, at *4 (E.D. Ky. Jan. 26, 2017) (finding that the defendant was entitled to qualified immunity because the plaintiff "ha[d] not responded to" the defendant's qualified immunity defense and "ha[d] therefore not met his burden"), *report and recommendation adopted*, CIVIL ACTION NO. 15-11-DLB-EBA, 2017 WL 630741 (E.D. Ky. Feb. 15, 2017); *Zavatson v. Sonnenfeld*, No. 14-10623, 2016 WL 5340785, at *21 (E.D. Mich. Sept. 23, 2016) (holding that the plaintiff did not meet his burden where he failed to "substantively address whether qualified immunity applies" or "cite even the general legal standards on the issue").

where, after repeated noncompliance by a pretrial detainee during booking, acts of physical resistance, and upon the detainee's insinuation that his noncompliance would devolve into further physical resistance, an officer used comparable force to control the detainee, and that force was deemed in violation of the constitution.  Absent clear precedent, Philpot was not fairly on notice that his response to Paul's insubordination was unconstitutional.

*Mosier v. Evans*, No. 23-5189, 2024 WL 93974, (6th Cir. Jan. 9, 2024), a recent Sixth Circuit decision with facts similar to the instant matter, is particularly illustrative.  Similar to Paul, the plaintiff in *Mosier* was arrested for an intoxication offense.  *See id.* at *1.  As the officer escorted Mosier toward the booking area, Mosier began resisting direction from the officer, who was gripping Mosier's overall straps.  *See id.*  When Mosier attempted to break away from the officer's grip, the officer pulled the strap forward and down, which caused Mosier to fall headfirst onto the floor.  *See id.*  The Sixth Circuit found that Mosier failed to meet his burden of "identifying a case that . . . put [the officer] on notice that his specific conduct was unlawful."  *See id.* at *3.  The conduct of both Mosier and the officer was too different from the conduct of the plaintiffs and the officials in the cases that Mosier relied upon in opposing qualified immunity.  *See id.*  Mosier was "more aggressive and threatening" than the "helpless and incapacitated" plaintiffs in two cited cases, while, simultaneously, the responding officers in those cases engaged in more severe force.  *See id.*  In two other cases, the officials used deadly force, which was not comparable to the force used against Mosier.  *See id.*  Therefore, since Mosier did not submit precedent adequately analogous to his own case, the officer was entitled to qualified immunity.  *See id.*

In the excessive force section of his response (and without reference to qualified immunity), Paul briefly cites the following cases in passing: *Kingsley v. Hendrickson* 135 S. Ct. 2466 (2015); *Graham v. Connor*, 109 S. Ct. 1865 (1989); *Bell v. Wolfish*, 99 S. Ct. 1861 (1979);

and *Coley v. Lucas Cnty.*, 799 F.3d 530 (6th Cir. 2015).  No case from the litany is sufficiently similar to the instant case for Paul to overcome Philpot's qualified immunity defense.  In *Kingsley* and *Graham*, the Supreme Court made no findings as to whether the defendant-officials acted unconstitutionally and remanded the cases to the lower courts.  *See Kingsley*, 135 S. Ct. at 2477; *Graham*, 109 S. Ct. at 1873.  *Bell* does not involve excessive force.  *See Bell*, 99 S. Ct. at 1872. *Coley* is an excessive force case, but, as in *Mosier*, the profile of the detainee and the nature of the force employed vary greatly from the circumstances here.  The detainee in *Coley* was fully restrained by handcuffs, a belly chain, and leg irons, and without provocation, an officer shoved the detainee, causing him to fall to the cement floor and hit his head on the wall.  *See Coley*, 799 F.3d at 539.  Later, while the detainee was handcuffed to his bed and surrounded by multiple officers, another officer choked the detainee until he was rendered unconscious, and the inmate subsequently died from his injuries.  *Id.* at 541.  Paul does not suggest that he was restrained to the same degree as the detainee in *Coley* or  that the force Philpot used against him was equivalent. Even based on Paul's own version of events, he was more defiant than the detainee in *Coley*.  Paul was unrestrained, stridently opposed to following the booking steps, insistent on setting his own procedure at the jail, and physically resistant.  In his words, "I stood up to him."  Paul Dep. 60:2. That the booking guard reacted by taking Paul to the ground and effecting control is not in violation of any case Paul offers that limns with clarity a deprived right.  At this level of generality, Paul cannot meet his burden to establish that Philpot violated his clearly established rights.

Therefore, Philpot is immune from liability as to the § 1983 excessive force claim.  The Court grants summary judgment for Philpot as to this claim.[3]

---

[3] Paul might try to suggest that the Philpot-Patrick divergence is the place to focus.  The Court disagrees. As noted, while Philpot and Patrick have some disagreement about what happened when Patrick was present, that vignette simply is not a part of what Paul presents as the actionable event in this case.  Paul

2.      § 1983 Failure to Adequately Hire, Train, and Supervise Claims

a.      Lawson (Count II)

To establish supervisory liability, a plaintiff must establish that the supervisory official "encouraged the specific incident of misconduct or in some other way directly participated in it." *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008) (citation and quotation marks omitted). Supervisory liability will only attach if the supervisor "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Coley*, 799 F.3d at 542 (citation and quotation marks omitted). A supervisor's negligence or recklessness is insufficient to impose liability. *See Does v. Whitmer*, 69 F.4th 300, 307 (6th Cir. 2023). The plaintiff must therefore point to a "specific action" of the supervisor that contributed to the constitutional violation. *See Phillips*, 534 F.3d at 544.

To the extent Paul argues that Lawson has supervisory liability for any use of excessive force in violation of § 1983, that claim fails. He produces no evidence that Lawson directly participated in or otherwise encouraged, authorized, approved, or acquiesced in Philpot's use of force against Paul. Indeed, undisputed evidence shows that Lawson was not present at the Detention Center the night of the incident. *See* Lawson Dep. (DE 103) at 66:3–66:8. Nothing post-incident appears that would signal ratification.

In alleging supervisory liability, Paul also broadly relies on evidence from Pat White, Judge Executive for the Fiscal Court, and Wayne Bird, the Chief of Police for the Williamsburg Police

---

criticizes Philpot for his actions after Patrick left the jail, and both Philpot and Patrick viewed the Osborne report (which addresses the macing and three separate uses of force) as encompassing events that were *distinct* from and omitted reference to the Philpot-Patrick interaction. *See* Philpot Dep. at 48:7–48:9 (noting that report "doesn't show the part where me and him first got into it until Strunk and Osborne walked in"); Patrick Dep. at 57:15–57:17 (calling Osborne summary "another incident that I have no involvement in whatsoever"). Paul cannot avoid summary judgment by pointing to factual issues over an episode that is not the basis for his Complaint in this case.

Department.  DE 114-1 at 3–4, 6.  Paul references statements that White made regarding aged

lawsuits against the Detention Center.  *See id.*  In a 2013 newspaper article, White discussed the

high insurance premiums that fiscal courts faced because of lawsuits against the county jail.  White

Dep. (DE 110) at 37:4–37:9, 38:22–39:8.  White also testified that some of the lawsuits against the

Detention Center included allegations that the staff was not properly trained, and he acknowledged

that members of the community would "[o]ccasionally" ask him about the lawsuits against the jail.

*Id.* at 16:8–16:11, 44:9–44:12.  At the outset, the Court notes that Paul provides no evidence

regarding the merits or outcomes of these lawsuits, namely, whether the lawsuits resulted in any

findings of constitutional violations.  Most notably, none of White's statements implicates Lawson,

and therefore, the statements cannot create a genuine dispute of material fact as to any specific

conduct involving Lawson.  Due to the lack of connection between this evidence and Lawson, any

assertion of supervisory liability cannot hinge on White's testimony.  Separately, Bird testified that,

as part of a criminal investigation, he gathered allegations that inmates were being assaulted at the

Detention Center and notified Lawson about the allegations.  *See* Bird Dep. (DE 113) at 12:6–

12:14, 26:19–26:14.  The record does not address whether any allegations were ultimately

substantiated.  Further,  Bird's testimony simply relates to the passing of information to Lawson;

it says nothing about whether Lawson participated in or encouraged any use of illegal force

perpetuated by his subordinates.  This testimony is merely suggestive and is simply insufficient to

hold Lawson liable in a supervisory capacity.[4]

      As to the allegation that Lawson failed to adequately supervise and train Philpot, Paul

submits evidence that Philpot never received training regarding proper mace usage and only

---

[4] Typically, an individual failure-to-train claim would improperly conflate individual liability and entity liability.  Absent "personal involvement in the underlying misconduct," the failure-to-train claims should be analyzed under entity liability rules.  *See Campbell v. City of Springboro*, 700 F.3d 779, 795 (6th Cir. 2012).

remembered receiving First Aid and CPR training. *See, e.g.*, Philpot Dep. 29:2–31:20. Contrary to Philpot's recollection, records indicate that Philpot fulfilled his credit hour requirement for training. *See* DE 109-4 (Exhibit 2, Training Record). Moreover, whether or not Philpot received OC spray training is irrelevant, as Paul ultimately identified *another* deputy as the individual that maced him. *See* Paul Dep. 70:14–70:20, 71:6–71:12. This evidence does not suggest that Lawson participated in or encouraged any unconstitutional conduct in connection with Philpot's supervision or training. Based on this discrepancy alone, Paul's supervisory liability claim against Lawson fails.

For all of these reasons, the Court therefore grants summary judgment for Lawson as to the supervisory liability claim.[5]

### b.    Fiscal Court (Count III)

§ 1983 claims against municipalities are not cognizable based on a theory of *respondeat superior*. *See Griffith v. Franklin Cnty.*, 975 F.3d 554, 579 (6th Cir. 2020). Instead, if a municipal employee injures a plaintiff, the plaintiff must "connect the employee's conduct to a municipal 'policy' or 'custom'" in order to hold the municipality liable. *Gambrel*, 25 F.4th at 408. The plaintiff can do so by showing "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of

---

[5] Logically, a claim of supervisory liability is derivative of the underlying § 1983 claim. *See Watson v. City of Marysville*, 518 F. App'x 390, 393–94 (6th Cir. 2013). Therefore, a prerequisite to a supervisory liability claim is that a constitutional violation occurred. *See id.* As the Court has found, Paul did not meet his burden to fulfill this prerequisite and overcome Philpot's federal qualified immunity defense. Because Paul's § 1983 excessive force claim against Philpot fails, any supervisory liability claim against Lawson must fail on this separate basis.

tolerance or acquiescence of federal rights violations." *Griffith*, 975 F.3d at 581 (citation and quotation marks omitted).

Here, Paul attempts to hold the Fiscal Court liable via the third route by raising an inadequate training and supervision claim. *See* DE 114-1 at 6–8. To establish a failure-to-train or -supervise claim, the plaintiff must demonstrate that (1) "the training or supervision was inadequate for the tasks performed;" (2) the municipality acted with "deliberate indifference" to the fact that "its inadequate training or supervision would lead its agents to violate constitutional rights;" and (3) the inadequate training or supervision "actually caused the plaintiff's injury." *Mosier*, 2024 WL 93974, at *5 (citation and quotation marks omitted); *Gambrel*, 25 F.4th at 408. A municipality acted with "deliberate indifference" if the "violation of a clearly established right was a known or obvious consequence" of the inadequate training or supervision. *Gambrel*, 25 F.4th at 408 (citation and quotation marks omitted). Typically, this requires proof that the municipality failed to act "in the face of repeated, known, rights violations," including a "pattern of similar constitutional violations." *See id.*; *Mosier*, 2024 WL 93974, at *5. The plaintiff must also prove "but-for" causation and proximate causation. *See Gambrel*, 25 F.4th at 408.

First, by statute, the Fiscal Court has no oversight over the training standards for county jails; that authority belongs to the Department of Corrections. *See* Ky. Rev. Stat. §§ 441.055(1)(a)(1)(d), 441.115(1). The Fiscal Court prescribes rules governing proper jail operation, § 441.045(1), but also has no oversight over the daily operations of the jail; that authority belongs to the jailer. *See Sowders v. Atkins*, 646 S.W.2d 344, 347 (Ky. 1983); *see also* White Dep. 17:11–17:18. Paul does not submit evidence to the contrary. In fact, he relies upon a statement from White, who testified that as a fiscal court judge, he does not "really have authority at the jail." *See* White Dep. 17:11–17:18. Paul criticizes White for "never discussing" allegations

of improper treatment in a "public meeting," *see id.* at 40:9–40:16, but the focus on the allegations again hardly links, causally or otherwise, any training custom or practice with events of liability in this case.  Further, Paul does not discuss or criticize the written policies approved by the Fiscal Court or tie any inadequacy to a constitutional violation here or to a foreseeable consequence generally.

Second, Paul has not presented enough evidence to establish genuine disputes on the elements of his inadequate training and supervision claim.  Paul has not made a threshold showing that inadequate training or supervision occurred at the Detention Center.  To support his claim, Paul submits deposition testimony stating that Philpot only received formal training on First Aid and CPR, and that Sergeant Osborne only received formal training on OC spray.  *See* Philpot Dep. 29:2–31:20; Osborne Dep. 12:15–12:24.  However, Paul, while cherry picking the recollections of two deputies, does not confront the overall approach to training at the jail or the policies and procedures in effect.  Paul's response does not explain why such training is inadequate or how the allegedly deficient training led to any specific constitutional violation.  Paul makes much non-specific ado about other lawsuits pending against the Detention Center and about a general criminal investigation into charges of inmate mistreatment.  *See* DE 114-1 at 7–8.  But he provides no detailed evidence about what those claims involved, the outcome of those proceedings, or whether the proceedings resulted in any findings of unconstitutional conduct.  These vague and untethered assertions do not establish a pattern sufficient to suggest that the Fiscal Court was deliberately indifferent to constitutional violations occurring at the Detention Center.  Paul also fails to provide evidence of a causal link showing that Philpot would not have used force against

Paul had he been properly trained.  Without evidence to support the elements of his claim, Paul's inadequate training and supervision claim must fail.[6]

Paul does not otherwise identify or present evidence of an illegal policy of the Fiscal Court, the official ratification of an illegal action by the Fiscal Court, or any custom indicating that the Fiscal Court tolerated or acquiesced in constitutional violations.   Therefore, Paul has not adequately connected the Fiscal Court to an unconstitutional custom or policy as required to hold the entity liable for Philpot's actions [7]  The Court accordingly grants summary judgment in favor of Fiscal Court as to this claim.

### C.      State Law Claims

#### 1.      Battery (Count VI) – Philpot

As with the federal claim against him, Philpot also raises the defense of qualified immunity as to the state law battery claim against him in his individual capacity.  *See* DE 111-1 at 15–16; DE 115 (Philpot Reply) at 2–3.  Under Kentucky law, a defendant is entitled to qualified immunity on a battery claim if his conduct was (1) a discretionary act or function; (2) taken "in good faith"; and (3) within the official scope of the defendant's authority. *See Yanero v. Davis*, 65 S.W.3d 510,

---

[6] Importantly, and this is not disputed, the jail had policies that addressed training, the jail policies purported to square with the KRS requirements, and Jailer Lawson testified to a minimum 24-hour per year training regime at the jail.  *See* Lawson Dep. at 23:9–23:14; *see also id.* at Depo. Exhibits (including part of procedural manual).  That some employees may not have complied or that the training may not have been effective across all employees does not, alone, equate to a basis for entity liability.

[7] Similar to the supervisory claim against Lawson, § 1983 liability for a municipality's failure to adequately hire, train, and/or supervise employees is also contingent on the success of the underlying § 1983 claim. *See Stricker v. Twp. of Cambridge*, 710 F.3d 350, 365 (6th Cir. 2013) (rejecting § 1983 negligent hiring, training, and retention claims because the plaintiff failed to first "demonstrate a constitutional violation at the hands of an agent or employee of the municipality") (citation and quotation marks omitted); *Grise v. Allen*, No. CV 5:11-195-KKC, 2017 WL 460810, at *3 (E.D. Ky. Feb. 2, 2017) (in the context of § 1983 failure to train and supervise claims, explaining that "[i]f no constitutional violation by the individual defendant is established under § 1983, the municipal defendants cannot be held liable under § 1983."). Since Paul cannot establish a § 1983 claim against Philpot, on this additional ground, the Fiscal Court is not liable under § 1983.

522 (Ky. 2001). Kentucky's qualified immunity inquiry follows a burden-shifting scheme similar to the federal analysis. *See id.* at 523. The defendant must first make a prima facie showing that "the act was performed within the scope of [his] discretionary authority." *Id.* Then, "the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith," i.e., *bad* faith. *Id.*; *see also Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006), ("'Good faith,' however, is somewhat of a misnomer, as the proof is really of 'bad faith.' In fact, in most cases, 'good faith' is just a presumption that exists absent evidence of 'bad faith.'"). In contrast to federal qualified immunity, in Kentucky, a plaintiff can premise bad faith on either an objective or subjective basis. *See Grant v. Wilson*, Civil No. 6:19-cv-00165-GFVT-HAI, 2021 WL 2636010, at *11 (E.D. Ky. June 25, 2021); *Hartman v. Thompson*, CIVIL ACTION NO. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *13 (W.D. Ky. Feb. 7, 2018). Therefore, a plaintiff can overcome a qualified immunity defense by demonstrating that the official "knew or reasonably should have known that the action he took" violated "'a constitutional, statutory, or other clearly established right'" (objective) or that he "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury" (subjective). *Grant*, 2021 WL 2636010, at *11 (quoting *Yanero*, 65 S.W.3d at 523); *Fletcher-Hope v. Louisville Metro Gov't*, No. 318CV00469RGJRSE, 2020 WL 1644040, at *5 (W.D. Ky. Apr. 2, 2020) (citation and quotation marks omitted). At all times, the plaintiff bears the burden of establishing the lack of good faith. *See Fletcher-Hope*, 2020 WL 1644040, at *5–6.

As the Court already found, Philpot has come forward with sufficient facts to suggest that he was acting within the scope of his discretionary authority when he used force against Paul. And, as a matter of Kentucky law, an official's "decision of how much force is required in a particular situation" constitutes a discretionary act. *Grant*, 2021 WL 2636010, at *11; *see also Fletcher-*

*Hope*, 2020 WL 1644040, at *5 ("The decision to administer force in an effort to maintain order and control is a discretionary act.") (citation and quotation marks omitted).

Having made his prima facie showing, the burden shifts from Philpot to Paul to establish that Philpot's use of force was in bad faith. Interestingly, Paul *does* respond, if only generally, to Philpot's assertion of state qualified immunity. Paul summarily argues that "[t]he evidence in the record, particularly from Dorman Patrick's testimony, does not support a finding on summary judgment that Defendant Philpot acted appropriately within his discretion, in good faith, and within the scope of his authority." DE 114-1 at 8. Paul states that Patrick's testimony "does not support a finding" that Philpot's actions were "objectively reasonable," and a genuine dispute of material fact exists as to whether "a reasonable jail deputy in Defendant Philpot's shoes could have perceived [Paul] as posing a threat." *Id.* at 8–9. Citing *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015), Paul contends that "[i]f a reasonable officer would not have perceived a threat, the force was unconstitutional." *Id.* at 8. However, Paul does not identify a specific constitutional, statutory, or other clearly established right that Philpot violated in undertaking his allegedly objectively unreasonable actions. And *Mullins* concerned a violation of the *federal* Constitution, not the Kentucky Constitution. *See Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 540 (6th Cir. 2018) (foreclosing the plaintiff's bad faith argument for state qualified immunity where the plaintiff stated that deputies "violated clearly established constitutional rights" but "raised no claim under the Kentucky Constitution"). Further, Paul does not marshal or provide any evidence to support that Philpot acted with malicious intent in using force against him. Without more, Paul has not met his burden to establish Philpot acted in bad faith. Defeating immunity requires the work and analysis from a plaintiff, and Paul here leans on facile conclusions.

Indeed, and again, Paul pivots to the Philpot interaction when Patrick remained at the jail. As noted previously, that is not the incident Paul sued over (*see* Complaint) or depicted in discovery. Whatever questions there might be about what happened in the initial scrape involving Patrick, the case hinges on the later uses of force and macing, which all took place at a point after Patrick left the jail.

Given that Paul cannot overcome Philpot's state qualified immunity defense, the Court finds that Philpot is entitled to qualified immunity as to the battery claim against him in his individual capacity. Therefore, the Court grants summary judgment for Philpot as to this claim.

### 2.  Negligence Claims (Counts IV, V, and VII) – Lawson

Lawson argues that he is entitled to summary judgment on the state law negligence claims against him in his individual capacity (negligence, negligence per se, and negligent hiring and retention) because the claims are barred by qualified immunity, and there is otherwise no genuine issue of material fact on the merits. DE 109-1 at 23–24, 26–31. Paul's response is completely devoid of any opposition to (or mention of) Lawson's qualified immunity defense or his argument on the merits. "[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Smith v. Windstream Commc'ns, Inc.*, No. CIV. 11-272-GFVT, 2013 WL 3233488, at *5 (E.D. Ky. June 25, 2013) (citation and quotation marks omitted); *see also* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."); *Scott v. State of Tenn.*, 878 F.2d 382 (Table), 1989 WL 72470, at *2 (6th Cir. 1989) ("If a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion.").

The Court finds that by failing to respond to Lawson's arguments regarding these claims, Paul concedes that Lawson is entitled to qualified immunity on the negligence claims and that those claims fail on their merits.

By the same token and in addition to waiving any opposition to Lawson's motion regarding these claims, Paul has failed to point to any evidence in support of his negligence claims. "Where . . . the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted." *Am. & Foreign Ins. Co. v. Sequatchie Concrete Servs., Inc.*, 441 F.3d 341, 344 (6th Cir. 2006) (citation and quotation marks omitted). Outside of the allegations in his complaint, Paul has not produced any evidence to establish his negligence claims or dispute Lawson's motion. Absent such evidence, summary judgment is appropriate. *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) ("The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.").

Nonetheless, had Paul adequately addressed Lawson's negligence arguments, his claims would still fail because Lawson is entitled to state qualified immunity. All three negligence claims essentially boil down to allegations that Lawson breached his duty to prevent harm against detainees through his hiring, supervision, and retention of Detention Center employees. *See* Compl. ¶¶ 57–68, 72–75. The hiring, supervision, and retention of jail employees constitute discretionary functions within the scope of Lawson's authority as the jailer. *See Yanero*, 65 S.W.3d at 522; *Robinson v. Kenton Cnty. Det. Ctr.*, No. 2011-CA-001095-MR, 2013 WL 560699, at *3–4 (Ky. Ct. App. Feb. 15, 2013). There is no indication in the record that Lawson performed these functions in bad faith. Lawson's deposition, the jail's policies and training rubric, and the nexus between local requirements and state mandates here put Lawson well within the sphere of

28

presumptive state qualified immunity.  Therefore, absent any contrary showing in response to the established defense, Lawson is immune from liability on the negligence claims against him in his individual capacity, and the Court, given Paul's silence, grants summary judgment in his favor.

### D.    Punitive Damages (Count VIII)

"Punitive damages is not a standalone claim in Kentucky."  *Correll v. Mut. of Omaha Ins. Co.*, No. 6:19-CV-97-REW-HAI, 2023 WL 6880385, at *7 n. 12 (E.D. Ky. Oct. 18, 2023).  Instead, a punitive damages claim is merely a "a remedy potentially available for another cause of action." *Petrey v. Ethicon, Inc.*, Civil Action No. 5:19-298-DCR, 2019 WL 5295185, at *3 (E.D. Ky. Oct. 18, 2019) (citation and quotation marks omitted).  Therefore, when the underlying causes of action have been dismissed, the Court must also dismiss the punitive damages claim.  *Price v. AgriLogic Ins. Servs., LLC*, 37 F. Supp. 3d 885, 901 (E.D. Ky. 2014).  Since the Court has dismissed all of Paul's other claims, there is no cause of action to which Paul may tie a punitive damages claim. Therefore, the Court must also dismiss the punitive damages claim.

### E.    Claims Against Detention Center

Finally, Paul lists the Detention Center as a defendant in his complaint but does not explicitly raise any cause of action against the Detention Center.  Because Paul has not asserted a cognizable claim against the Detention Center (really, a subset of the County itself), the Court dismisses the Detention Center as a party to this action.  *Cf. McGlory v. Michigan Dep't of Corr.*, No. 21-2692, 2022 WL 18229595, at *2 (6th Cir. July 27, 2022) (finding that a complaint failed to state a claim for relief where it "identified the defendants in the caption and list of parties but did not connect either defendant to any specific conduct in the statement of claim").[8]

---

[8] Regardless, the Detention Center is not separately amenable to suit under § 1983.  *Ellis v. Campbell*, Civil Action No. 3:08CV-P458-S, 2009 WL 86605, at *2 (W.D. Ky. Jan. 12, 2009) ("Municipal departments, such as jails, are not amenable to suit under § 1983.).

**IV.    Conclusion**

For the reasons stated, the Court **GRANTS** DE 109 and DE 111, and **DISMISSES** the Plaintiff Gary W. Paul's remaining claims **WITH PREJUDICE**.  The Court will enter a separate judgment.

This the 17th of January, 2024.

Signed By:

_**Robert E. Wier**_

**United States District Judge**